# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| AUTO CHEM LABORATORIES, INC., *et al.*, | **:** | |
| | **:** | Case No. 3:07CV156 |
| Plaintiffs, | | |
| | **:** | District Judge Walter Herbert Rice |
| vs. | | Magistrate Judge Sharon L. Ovington |
| | **:** | |
| TURTLE WAX, INC., | | |
| | **:** | |
| Defendant. | | |
| | **:** | |

## AMENDED REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

During the 1990s the parties in this case engaged in a mutually beneficial business relationship involving the development, manufacture, marketing, and distribution of high-end automobile appearance products.  Their business relationship is now defunct.

Plaintiffs bring this case claiming that Defendant Turtle Wax is liable under five theories:  (1) promissory estoppel, (2) fraudulent misrepresentation, (3) fraudulent concealment, (4) breach of implied-in-law contract/constructive contract, and (5) breach of express contract.  (Doc. #2 at 15-21).[2]  Plaintiffs have voluntarily dismissed without

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Amended Report and Recommendations.

[2] Citations to the Complaint (Doc. #2) refer to the page number assigned by the Court's electronic docketing system or to the specific paragraph(s) in the Complaint.

prejudice two other claims: negligent misrepresentation and conversion. (Doc. #15).

Plaintiffs originally filed this case in the Court of Common Pleas, Montgomery County, Ohio. Turtle Wax removed the case to this Court under the Court's diversity jurisdiction. Because the Court has diversity jurisdiction over this case, *see* 28 U.S.C. §1332; *see also* Doc. #2 at 7-22, the Court applies the substantive law of Ohio to Plaintiffs' state-law claims while likewise applying federal procedural rules. *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

The case is before the Court on Turtle Wax's Motion to Dismiss Plaintiffs' Complaint (Doc. #10), Plaintiffs' Memorandum in Opposition (Doc. #11), Turtle Wax's Reply (Doc. #13), Plaintiffs' Motion to Strike (Doc. #14), Turtle Wax's Response (Doc. #17), Plaintiffs' Motion for In Camera Inspection (Doc. #20), and the record as a whole.

## II.  PLAINTIFFS' FACTUAL ALLEGATIONS[3]

### A.  The Parties' Early Years

Plaintiff Auto Chem Laboratories, Inc. is an Ohio corporation engaged in the business of developing, manufacturing, and marketing high-end professional automobile appearance products. Plaintiff ProCraft Industries, Inc. is an Ohio corporation engaged in the business of distributing high-end professional automobile products directly to automobile dealerships. Plaintiff Bruce Culpepper is president of both Auto Chem and

---

[3]  At this early stage of the case, the Court accepts as true the Plaintiffs' well-pled factual allegations. *Infra.*, §III.

2

ProCraft.

Turtle Wax is an Illinois corporation that makes and markets products including auto appearance and cleaning products.

During the early years of the parties' business relationship (roughly 1989-1993), Plaintiff Auto Chem supplied Turtle Wax with various professional auto appearance products for use – under Auto Chem's label – in Turtle Wax's auto appearance centers and car washes.

During the 1993-95 time period, Randy Wingert, marketing manager of Turtle Wax's auto appearance division, asked Plaintiff Culpepper to develop a line of private label products for Turtle Wax under the brand name, "Super PolyShell ('SPS line')." *Id.* at 3. Plaintiffs allege:

> Over the course of many years, and commencing on or about 1993, various principals at Turtle Wax, including but not limited to Wingert, told and confirmed to Culpepper that Turtle Wax wanted to partner with Auto Chem for the development, manufacture, marketing, sale and distribution of the SPS line. More particularly, Auto Chem was to be the exclusive manufacturer of the SPS line, and exclusive national distribution and fulfillment center for the SPS line for Turtle Wax.
>
> Commencing on [sic] or about 1993, Auto Chem accepted Turtle Wax's proposal to enter into a partnership toward developing the SPS line as aforesaid....

(Doc. #2 at 8). The Complaint describes six terms upon which Auto Chem and Turtle Wax agreed including, for example, "Auto Chem was to co-author (with Turtle Wax) ... the brand and design of product labels for four to seven products"; and "Auto Chem was to provide on-site 'hands-on training' at Turtle Wax's Car Wash and Auto Appearance

Center in Chicago for use and explanation on the products."  *Id*. at 3-4.

**B.**      **1994 to 2000 and Culpepper's Consulting Agreement**

In 1994, various individuals at Turtle Wax, including Michael Schultz, sought

proprietary information from Auto Chem.  "At that time, Auto Chem believed that

disclosure of this proprietary information to Turtle Wax was necessary to further its

partnership with Turtle Wax, and thus provided information to Turtle Wax about the

contents of Auto Chem's products...."  *Id*. at 4.  Five years later, in June 1999, Turtle Wax

requested labeling information from Auto Chem.  According to Plaintiffs:

> Upon information and belief, the real purpose for the gathering of
> this proprietary information from Auto Chem was so that Turtle Wax could
> later duplicate Auto Chem's formulas and produce them without paying
> Auto Chem for them, and in contrary to the partnership relationship....

(Doc. #2 at 9).

"By 1997, Auto Chem was developing a *complete* line of professional grade auto

appearance formulas for Turtle Wax under the SPS brand name.  In furtherance of those

increased and successful activities, Turtle Wax entered into a concomitant, supplemental

consulting agreement with Culpepper in 1997."  (Doc. #2 at 10).

During 1997 through approximately 1999, Auto Chem engaged in various other

successful activities at Turtle Wax's request, including Plaintiff Culpepper's consulting

work with Wingert on various marketing strategies and Culpepper's work in co-authoring

the July 1997 SPS line's product catalog.  Culpepper alone came up with the catalog's

"system approach," a marketing breakthrough for the auto appearance industry.  *Id*. at 5.

4

"In furtherance of the parties' agreement, Auto Chem devoted approximately 60% of its employees' time to development of the SPS line, and its (Auto Chem's) considerable expense." *Id*.

During 1998 or 1999, Turtle Wax provided certain test market revenue forecasts, predicting (optimistically, as it turned out) sales for the SPS line's first three years on the market:  Year 1: $1,797,920; Year 2: $2,333,606; Year 3: $2,917,008.  (Doc. #2 at 10).

From 1995 to 2000 Plaintiff Culpepper – a veteran of the auto-appearance industry – mentored Wingert in various other marketing strategies and business concepts. "Ultimately, it was Culpepper's two-page dealer marketing agreement that was accepted by Turtle Wax's customers – in an industry where a hand-shake, and one's word, were usually sufficient – and instead of a sixteen-plus page document authored by Turtle Wax's then counsel."  (Doc. #2 at 11).

At Turtle Wax's request, Culpepper also personally trained Turtle Wax's sales and marketing staff about marketing tools and strategies necessary to sell the SPS line of products.

Plaintiffs further allege:

> [O]n or around June 8, 1999, Turtle Wax requested labeling information from Auto Chem.  Again, Auto Chem provided the requested information.  Upon information and belief, the real purpose for gathering this proprietary information from Auto Chem was so that Turtle Wax could later duplicate Auto Chem's formulas and produce them without paying Auto Chem for them....

(Doc. #2 at 9).

5

### C.   The "TD Line" and Other Events

Auto Chem also developed, at Turtle Wax's request, many new products based on the SPS line.  Auto Chem's "considerable efforts resulted in 115 SKUs being provided to Turtle Wax by Auto Chem."  *Id.* at 7.  Auto Chem named this new line of products "Detailing Systems" or the "TD line."  *Id.*

Turtle Wax forecast approximately $2 million dollars in purchases of the TD line from Auto Chem.  (Doc. #2 at 11-12).  In addition, "[c]onsistent with the parties' prior relationship regarding the SPS, Auto Chem continued to be the exclusive manufacturer and developer of this additional line of product."  *Id.* at 12.  And, according to Plaintiffs, Auto Chem established 64 SKUs for the TD line, consistent with the parties' agreement.  *Id.*

Around January 2000, Turtle Wax signaled its interest in potentially buying Auto Chem.  Turtle Wax, through Wingert, sought and gained from Plaintiff Culpepper sensitive information about Auto Chem and its finances.  Wingert and Plaintiff Culpepper specifically discussed the possible sale on many occasions.  At this same time, Turtle Wax told Auto Chem that it could expect Turtle Wax to buy "approximately $1.2 in the next year (SPS purchase of approximately $730,000, and TD purchases of approximately $470,000)."  (Doc. #2 at 13).

### D.   Plaintiff ProCraft and Termination of the SPS Line

Plaintiff ProCraft came into existence as follows:

> In July 2000, and after Turtle Wax had formally appointed Auto

6

Chem as the authorized distributor for Turtle Wax SPS line for the [S]tate of Ohio, Culpepper set up a separate entity, called ProCraft Industries, as a distributorship to specifically handle and service auto dealerships, for Turtle Wax, in Auto Chem's existing markets.

(Doc. #2 at 13).

In late 2000, Thomas Healy, the vice president of Turtle Wax's industrial division, encouraged Plaintiff Culpepper to solicit orders for Turtle Wax products, even products not produced by Auto Chem (such as FLEXPAK Professional car wash products). Plaintiffs maintain, "Upon information and belief, Healy was then planning to discontinue the SPS line – and needed Culpepper's contacts and customer base to introduce Turtle Wax's TD and other, non-Auto Chem products to them – but failed to disclose this to Plaintiffs." (Doc. #2 at 13).

On January 19, 2001, Healy told Auto Chem that Turtle Wax would stop selling the SPS line. *Id*. This did not rupture the parties' ongoing business relationship. Instead, intense discussion ensued from January 2001 through March 2001 between Auto Chem and Turtle Wax about product development, marketing, and distribution. And, "[d]espite Turtle Wax's discontinuation of the SPS product, Healy nevertheless affirmed Turtle Wax's commitment to the TD line, and reassured Auto Chem of Turtle Wax's continuing commitment to it." (Doc. #2 at 14). "In turn, Culpepper committed to using his vast contacts and connections throughout the automotive industry to sell various Turtle Wax products, including those products not produced by Auto Chem...." *Id*.

On or near January 19, 2001, Healy also told Culpepper that Turtle Wax was going

to continue to purchase the TD line from Auto Chem.  At this time, "Turtle Wax principals told Auto Chem that Auto Chem could expect annual, recurring purchases totaling at least $400,000 per annum.  Based upon those representations, Auto Chem switched its marketing efforts exclusively to the TD line, as specifically requested by Healy."  (Doc. #2 at 14).

"Healy later again confirmed this specific commitment to the TD line on May 9, 2001." *Id*.

Despite Turtle Wax's representations, it only purchased the following approximate amounts of TD Line products from Auto Chem:

    2001 ≈ $165,000
    2002 ≈ $167,000
    2003 ≈ $90,000
    2004 ≈ $13,000

*Id*. at 9-10.

### E.    The End

Turtle Wax's final purchase of TD line products from Auto Chem occurred in February 2004.

Plaintiffs explain, "To date, Auto Chem has never been officially terminated as supplier or exclusive manufacturer of Turtle Wax's TD line although, upon information and belief, that line was apparently discontinued by Turtle Wax some time in 2005, and without Auto Chem's input, knowledge or consent."  (Doc. #2 at 15).

Plaintiffs summarize their allegations as follows:

8

Thus, and over the course of many years, Turtle Wax used Auto Chem's extensive human resources – specifically, Culpepper's nearly 40 years of intimate industry experience – to its (Turtle Wax's) great advantage. Specifically, Turtle Wax: (1) asked Culpepper to personally involve himself in the development and creation of the packaging and labeling for the two lines; (2) entrusted its own employees and sales personnel to Culpepper for hands-on, on-site training in marketing and industry operations, and (3) availed itself of Auto Chem and Culpepper's personal industry contacts and customers to its (Turtle Wax's) pecuniary advantage. Simply put, Turtle Wax saw Culpepper and Auto Chem as an asset, and used them to further and effectively penetrate the professional car care marketplace.

(Doc. #2 at 12).

## III. MOTIONS TO DISMISS

### A. <u>Rule 12(b)(6) and Pleading Standards</u>

Turtle Wax seeks dismissal of Plaintiffs' claims under Fed. R. Civ. P. 12(b)(6).

When evaluating a Rule 12(b)(6) Motion to Dismiss for failure to state a claim, the Court accepts as true the Complaint's well-pled allegations and determines "whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief." *Eidson v. State of Tenn. Dept. Of Children's Serv.*, 510 F.3d 631, 634 (6th Cir. 2007).

"[T]o survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory.... Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Eidson*, 510 F.3d at 634 (citing in part *Bell Atlantic v. Twombly*, __ U.S.__, 127 S.Ct. 1955, 1965 (2007)). "Even under Rule 12(b)(6), a

9

complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient.  The '[f]actual allegations must be enough to raise a right to relief above the speculative level'; they must 'state a claim to relief that is plausible on its face.'"  *Bishop v. Lucent Technologies, Inc*., 520 F.3d 516, 519, (6th Cir. 2008) (quoting in part *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965, 1974 (2007)).

### B.    Pleading to Avoid an Affirmative Defense – Statute of Limitations

If a defendant's Motion to Dismiss under Rule 12(b)(6) succeeds in showing – based on the allegations of the Complaint – an apparent time bar, plaintiff may not remain silent about when they first acquired knowledge in the hope they will be able to establish a timely entitlement to relief.  *Bishop*, 520 F.3d at 520.  "When it affirmatively appears from the face of the complaint that the time for bringing a claim has passed, the plaintiff cannot 'escape the statute by saying nothing."  *Bishop*, 520 F.3d at 520.

Analytic care must be taken when considering a potential application of a statute of limitations to bar a Complaint, because this is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and as a result, the defendant must first demonstrate that a time bar is "'apparent from the face of the complaint....'"  *Bishop*, 520 F.3d at 519 (quoting in part *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)).  Thus although a complaint may effectively plead itself into a statute of limitations problem, *see, e.g., Bishop*, 520 F.3d at 519-22, this occurs only "when the face of the complaint

clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996).

## IV. DISCUSSION

### A. Count I – Promissory Estoppel

#### 1.
#### Plaintiffs' Claim

Plaintiffs' claims of promissory estoppel is based, in pertinent part, on the following allegations:

> Turtle Wax made clear and unambiguous promises and representations about the amount of business Turtle Wax would do with Auto Chem in exchange for Auto Chem's work on developing product lines....  Plaintiffs reasonably relied on Turtle Wax's clear and unambiguous promises and/or representation and, among other things, developed various product lines requested by Turtle Wax, expended large amounts of resources on the marketing [of] those products for Turtle Wax, and forebore other business opportunities to associate themselves with other entities and businesses, and/or develop other similar such products for those businesses....

(Doc. #2 at 15).

#### 2.
#### Forecasts v. Promises

"Under Ohio's promissory estoppel doctrine, a promise that the promisor 'should reasonably expect to induce action or forbearance on the part of the promisee or a third person and ... [that] does induce such action or forbearance is binding' if one can avoid injustice only by enforcing the promise.'" *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496,

11

503 (6th Cir. 2003)(citations omitted). One essential element (among several) of promissory estoppel is the existence of a clear and unambiguous promise. *Id*.

Turtle Wax maintains that Plaintiffs' promissory estoppel claim fails as a matter of law because the future sales forecasts or expectations alleged in the Complaint were not promises. Turtle Wax draws a parallel between the unreasonable reliance found in *Micrel, Inc. v. TRW, Inc.*, 2005 U.S. Dist. LEXIS 9430 at *30 and Plaintiffs' similarly unreasonable reliance on Turtle Wax's future forecasts.

For reasons detailed below, *infra*, §IV(D), Turtle Wax's reliance on the predictive nature of its alleged future promissory lacks merit because the Complaint alleges sufficiently clear and unambiguous promises in support of the promissory estoppel Complaint. The cases, moreover, upon which Turtle Wax relies do not contradict this conclusion. For example, the future action – rather than clear, unambiguous promise – at issue in *George v. City of Mansfield*, 1990 WL 125474 at * (Ohio App. 1990) concerned possible legislative action, a far cry from Turtle Wax's clear and unambiguous promises identified in the Complaint.

**3.**
**Statute of Limitations**

Turtle Wax argues that this claim is barred by the applicable Ohio statute of limitations and by Ohio's statute of frauds.

"In certain circumstances, the doctrine promissory estoppel, can be applied 'to enforce a promise that does not meet the criteria of a formal contract.'" *Lambert v.*

12

*Kazinetz*, 250 Fed. Supp.2d 908, 916 (S.D. Ohio 2003)(Marbley, D.J.)(quoting in part

*Healey v. Republic Powdered Metals, Inc*., 85 Ohio App.3d 281 (1992)). Promissory

estoppel in Ohio consists of four elements: "(1) a clear and unambiguous promise; (2)

reliance by the party to whom the promise is made; (3) reasonableness and foreseeability

of that reliance; and (4) injury by the party claiming estoppel." *Lambert* 250 F.Supp.2d at

916 (citing *Rigby v. Fallsway Equip. Co., Inc*., 150 Ohio App.3d 155 (2002)).

Ohio applies a six-year statute of limitations to claims of promissory estoppel. *See*

Ohio Rev. Code §2305.07. For purposes of its Motion to Dismiss, Turtle Wax concedes

as much "in order to limit the issues in dispute." (Doc. #13 at 5, n.1). To be timely, then,

these claims must have accrued on or after March 26, 2001.

A claim of promissory estoppel accrues "when the non-breaching party discovers

'the omission to perform as agreed.'" *See ATD Corp. v. Daimler Chrysler Corp*., 261

F.Supp.2d 887, 894 (E.D. Mich. 2003)(applying Ohio law) (citing *Kotyk v. Rebovich,* 87

Ohio App.3d 116, 121 (1993)). A breach of implied contract accrues when the promisee

fails to satisfy its contractually promised duties. *See ATD Corp*., 261 F.Supp.2d at 894;

*see also Laubenthal v. Midwestern Indem. Co*., 1998 WL 195870 at *4 (Ohio App.

1998)("In general, basic legal principles hold that a cause of action accrues at the time of

the offending event. Such is the case in claims for promissory estoppel, breach of

contract and fraud.").

Plaintiffs contend that Ohio's six-year statute of limitations does not bar the

promissory estoppel and contract claims because these accrued on June 15, 2004, when

13

their then-counsel sent a letter to Defendants. This contention lacks merit because it does not identify the date on which Turtle Wax failed to fulfill its promises.

Turtle Wax contends that the statute of limitations began to run on Plaintiffs' claims of promissory estoppel either (1) in January 2000 when Turtle Wax revised the sales forecasts for the SPS and TD lines or (2) on January 19, 2001 when Turtle Wax discontinued the sale of the SPS line, or (3) on December 31, 2001 when the sales of the TD line for the year were drastically less than Turtle Wax forecasted.

Plaintiffs learned of Turtle Wax's first unmet promises in January 2000 when Turtle Wax drastically reduced its revenue forecasts regarding the SPS and TD lines and on January 19, 2001, when Turtle Wax cancelled the sale of the SPS line of products. Each of these unmet promises occurred before March 26, 2001, and consequently, to the extent Plaintiffs base their claims of promissory estoppel and breach of implied-in-law contract on those pre-March 26, 2001 events, their claims are time barred.

Yet Plaintiffs further allege that Turtle Wax failed to fulfill its promises after March 26, 2001. For example, Plaintiffs claim that at the end of the year 2001, Turtle Wax had purchased from Auto Chem only $165,000 worth of TD line products in 2001, far less than its forecasts of $400,000 in annual yearly purchases. *See* Doc. #2 at ¶34-35. Similarly, Plaintiffs Turtle Wax next yearly purchases of the TD line productions continued to be less than promised: "approximately $167,000 for 2002, approximately $90,000 for 2003, approximately $13,000 for 2004. Turtle Wax's final purchase of the TD line of products from Auto Chem was in February 2004." (Doc. #2 at ¶35).

14

Accepting these allegations as true, many of Turtle Wax's alleged unfulfilled promises and breaches of implied contract occurred after March 26, 2001.  *See* Doc. #2 at 14-15. In light of these allegations, Plaintiffs' claims of promissory estoppel and breach of implied contract are not time barred to the extent they concern events that occurred after March 26, 2001.

**4.**
**Statute of Frauds**

Turtle Wax argues that Plaintiffs' promissory estoppel claim is barred by Ohio's statute of frauds.

Citing *Worrell v. Multipress*, 45 Ohio St.3d 241, 243 (1989) and *Lambert v. Kazinetz*, 250 F.Supp.2d 908, 916 (S.D. Ohio 2003)(Marbley, J.), Plaintiffs contend, "The doctrine of promissory estoppel takes an agreement out of the application of the Statute of Frauds."  (Doc. #11 at 7).  The page in *Worrell* Plaintiffs pinpoint notes in part, "the [Ohio Court of Appeals] held that the trial court properly instructed the jury that the doctrine of promissory estoppel may overcome the requirement of the statute of frauds." 45 Ohio St.3d at 143.  Without further explanation (none appears in *Worrell*), the use of term "may" – being permissive – allows but does not conclusively remove an agreement from the statute of frauds.

In *Lambert*, the District Court explained:

> In certain circumstances, the doctrine of promissory estoppel can be applied 'to enforce a promise that does not meet the criteria of a formal contract.'  *Healy v. Republic Powdered Metals, Inc*., 85 Ohio App.3d 281... (1992).  To state a claim for promissory estoppel, the plaintiff must allege:

15

> (1) a clear and unambiguous promise; (2) reliance by the party to whom the promise is made; (3) reasonableness and foreseeability of that reliance; and (4) injury by the party claiming estoppel.....

*Lambert*, 250 F.Supp.2d at 916 (remaining citations omitted).  Although *Lambert* does not specifically mention the statute of frauds, it is reasonable to read *Lambert* as permitting a promissory estoppel claim to proceed without being hindered by the statute of frauds – in certain circumstances.  *See Lambert*, 250 F.Supp.2d at 916-17.  The reasonable nature of this conclusion appears in *Lambert* in the District Court's decision to deny the Motion to Dismiss the promissory estoppel claim based on the Complaint's well-pled allegations.  *See id*.  There is, moreover, case law providing that even if a promissory Ohio's statute of frauds bars an oral contract claim, it "in no way bars the promissory estoppel claim."  *R. Renaissance, Inc. v. Rohm and Haas Co*., 674 F.Supp. 591, 595 (S.D. Ohio 1987)(Porter, J.).

Based on *Landskroner v. Landskroner*, 154 Ohio App.3d 471, Turtle Wax contends that the statue of frauds bars Plaintiffs' promissory estoppel claim.  The Ohio Court of Appeals in *Landskroner* reasoned:

> Although some courts have allowed a promissory-estoppel claim to bar a Statute of Frauds defense, the court has limited the application of promissory estoppel to cases where there has been either a misrepresentation that the Statute of Frauds' requirements have been complied with or a promise to make a memorandum of agreement.... Appellant makes no such allegations in this case and he can, therefore, prove no set of facts that would entitle him to relief on this claim. As such, dismissal under Civ. R. 12(B)(6) was proper as to appellant's claim for promissory estoppel.

154 Ohio App.3d at 489 (citing *McCarthy, Leib, Crystal & Haiman Co., L.P.A.*, 87 Ohio

App.3d 613, 627 (1993)).

Turtle Wax has not cited a case decided by the Ohio Supreme Court consistent with the limitation set by *Landskroner*. Plaintiffs have not cited a case discussing or specifically rejecting *Landskroner*, which was decided many years after the cases on which Plaintiffs rely.

Thus, the cases on which both parties rely do not resolve the particular problem faced in this diversity case: whether or not Ohio law, as declared by the Ohio Supreme Court, limits the doctrine of promissory estoppel as discussed in *Landskroner*. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001). The Ohio Supreme Court has yet to accept or reject the *Landskroner* limitation. Some Ohio Courts of Appeals adopt this limitations; some do not. *See Neimi v. NHK Spring Co., Ltd*., 481 F.Supp.2d 869, 874 (N.D. Ohio 2007)(Carr, C.J.)(citing in *Connolly v. Malkamaki*, 2002 WL 3183040 at *4-*5 (Ohio App. 2002)(other citations omitted).

The parties' Memoranda contain precious little analysis of this significant aspect of Ohio law. *See* Doc. #10 at 12; Doc. #11 at 7-11; Doc. #13 at 11-12). Consequently, the issue has not received the benefit full adversarial briefing at this point in the case. In light of this, and because some authority exists in support of the proposition that Ohio's doctrine of promissory estoppel is not limited, at least in some circumstances, as set forth in *Landskroner*, the statute of frauds does not bar Plaintiffs' claim of promissory estoppel. *See Neimi*, 481 F.Supp.2d at 874; *see also Connolly*, 2002 WL 3183040 at *4-*5.

17

B.    **Counts V and VI: Breach of Contract – Statute of Limitations**

**1.**
**Plaintiffs' Claims and Ohio Contract Law**

Plaintiff claims that Turtle Wax breached the parties' implied-in-law/constructive

contracts (Count V) and their express contracts (Count VI).  They base these claims on

Turtle Wax's alleged breaches in three categories:

1.    **Product Purchase Contracts**:  Turtle Wax breached its duty to purchase
      certain amounts of product from the SPS and TD lines.

2.    **Auto Chem Purchase Contracts**:  Turtle Wax's breached its duty to
      purchase Plaintiff Auto Chem.

3.    **Partnership Contract**:  Turtle Wax breached its duty to engage in a
      mutually beneficial partnership concerning the research, development,
      manufacture, marketing, and sales of the SPS and TD lines of products.

"In Ohio, 'it is well-established that there are three classes of simple contracts:

express, implied in fact, and implied in law.'...  An express contract occurs when the

parties' assent to a contract's terms is expressed through an offer and acceptance....  A

contract implied in fact occurs when a meeting of the minds is demonstrated by

surrounding circumstances, allowing a factfinder to infer the existence of a contract by

tacit understanding....  A contract implied in law occurs when there is no meeting of the

minds, and the law creates an obligation on a person who received a benefit and would be

unjustly enriched by the benefit."  *United Nat. Ins. Co. v. SST Fitness Corp.*, 309 F.3d

914, 919 (6th Cir. 2002) (quoting in part *Legros v. Tarr,* 44 Ohio St.3d 1, 6, 540 N.E.2d

257 (1989))(other citations omitted); *see Morgan v. Del Global Technologies Corp.*, 2007

18

WL 3227068 at *15 (S.D. Ohio 2007)(Rose, J.) (citations omitted).

**2.**
**Applicable Statute of Limitations and Accrual**

The parties' contentions concern three Ohio statutes of limitations: Ohio's four-year statute of limitations for claims based on a breach a contract for the sales of goods, *see* Ohio Rev. Code §1302.98; a six-year statute of limitations for a claim based on a breach of a verbal contract (whether express or implied), *see* Ohio. Rev. Code. § 2305.07; and a fifteen-year statute of limitations for a claim based on a breach of a written contract, *see* Ohio Rev. Code §2305.06.

In Ohio, "[a] cause of action for breach of contract accrues when the breach occurs or when the complaining party suffers actual damages." *Bell v. Ohio State Bd. of Trustees*, 2007 WL 1640968 at *7 (Ohio App. 2007)(citing in part *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co*., 42 Ohio App.3d 6, 9 (1988)). A claim for breach of contract arising from the sale of goods accrues when the breach occurred "regardless of the aggrieved party's lack of knowledge of the breach...." Ohio Rev. Code §1302.98(B).

Because Plaintiffs filed their Complaint in state court on March 26, 2007, to be timely, their breach of contract claims must have accrued before the following dates:

1.  **Product-Purchase Contracts**. On or before March 26, 2003, applying Ohio's four-year statute of limitations concerning contracts for the sale of goods.

2.  **Auto Chem Purchase Contract**. On or before March 26, 2001, if based on a verbal contract. If based on a written contract, this claim is timely.

3.  **Partnership Contract**. On or before March 26, 2001, if based on a verbal

19

contract. If based on an written contract, this claim is timely.

The issue, then, is when did Turtle Wax breach each of these categories of claims

### 3.
### Plaintiffs' Contentions

Plaintiffs contend that Turtle Wax is relying on its own "gratuitous admissions as to *when it believes* it entered into its agreement(s) with Plaintiffs, and *when it believes* it thereafter breached those agreement(s) with Plaintiffs.... Plaintiffs causes of action did not accrue until on or about June 15, 2004 when ... Plaintiffs' then-counsel sent Turtle Wax a 'letter threatening to file a complaint for damages in excess of $1 million dollars...." (Doc. #11 at 2).

Plaintiffs are correct to the extent they assert that the correct accrual dates must not be based on when Turtle Wax, or Plaintiffs for that matter, believe they entered into the contract. The correct focal point is when the breach of contract occurred or when Turtle Wax suffered actual damages. *See Bell*, 2007 WL 1640968 at *7 (and cases cited therein). Plaintiffs, however, are incorrect to rely on the June 2004 letter by their then-counsel. Any knowledge of the alleged breaches asserted in the June 2004 letter does not preclude the possibility that Plaintiffs' knew, or should have known of the breaches well before June 2004. This is particularly so with regard to Plaintiffs' allegations concerning Turtle Wax's repeated breaches to purchase goods – certain amounts of SPS and TD line products – because such claims accrued when the breaches occurred even if Plaintiffs lacked knowledge of the breaches. *See* Ohio Rev. Code §1302.98(B). For these reasons,

20

Plaintiffs' then-counsel's letter of June 2004 does not as establish the correct accrual date for their breach of contract claims.

This conclusion does not end the inquiry because a statute of limitations defense constitutes an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and because Turtle Wax seeks dismissal by way of a Rule 12(b)(6) Motion to Dismiss. Turtle Wax therefore bears the burden of demonstrating that Plaintiffs' claims are time barred based solely on the allegations set forth in the Complaint. *See Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002)("the party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run."). And another point must be stressed: Although the affirmative defense of statute of limitations may support dismissal under Rule 12(b)(6), *e.g., Bishop*, 520 F.3d at 520, this occurs only "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 181 (4th Cir. 1996).

**4.**
**Product-Purchase Claims**

Plaintiffs' claims that Turtle Wax breached its initial promises (given in 1998-1999) to purchase certain amounts of product from the SPS and TD line accrued by late January 2001 at the latest. In 1998/1999, Turtle Wax originally promised to purchase certain SPS line products by forecasting specific dollar amounts it would purchase over the next three years. (Doc. #2 at ¶17). Although the Complaint does not allege precisely when Turtle Wax made similar promised purchases of the TD line products, it is

21

reasonable to infer that these promises were given in this time period.  *See* Doc. #2 at ¶s17-23.

In January 2000 Turtle Wax breached its duty to purchase those amounts of product by reducing its forecasted purchases of both the SPS and TD line products.  *See* Doc. #2 at ¶s 26-27.  Turtle Wax informed Plaintiffs about these lower anticipated purchases in or around January 2000 thus providing them with actual knowledge of the breach.  Consequently, to the extent Plaintiffs' claims for breach of express or implied-in-law verbal contract is based on Turtle Wax's failure to purchase the definite dollar amounts of SPS and TD line products it originally promised, these claims accrued in or near January 2000 triggering the applicable statute of limitations.  Regardless of which statute applies – either Ohio's four-year statute of limitations (breach of contract for sale of goods) or Ohio's six-year statute of limitation (for breach of verbal contract) – these time limitations expired before Plaintiffs filed their Complaint in state court in March 2007.  Plaintiffs' claims that Turtle Wax breached its initial promises to purchase certain amount of SPS and TD line products are therefore untimely.

Turning to Turtle Wax's discontinuation of its purchases of the SPS line products, this occurred on January 19, 2001.  *See* Doc. #2 at ¶30.  Any contract claim related to this breach accrued at that time.  And, consequently, regardless of whether the four- or six-year statute of limitations applies, these time limitations expired before Plaintiffs filed their Complaint in March 2007.  Plaintiffs' breach of verbal contract claims and breach of implied-in-law contract claims related to the discontinuation of the SPS line are therefore

22

time barred.

This leaves Turtle Wax's breaches with regard to its promises in 2001 to annually purchase $400,000 of TD line products from Plaintiff Auto Chem. *See* Doc. #2 at ¶s 33-34. Plaintiffs claim that Turtle Wax only purchased the following amounts of TD line products: $165,000 during 2001 and $167,000 during 2002. Plaintiffs had actual knowledge, or a reasonable person in their person would have known, of each of these breaches at the close of each respective year or soon thereafter. Consequently, Ohio's four-year statute of limitations applicable to Turtle Wax's promised purchases of TD line of products – which involved the sale of goods withing the meaning of Ohio Rev. Code §1302.98 – began to run at or soon after the close of 2001 and 2002. Consequently, Ohio's four-year limitations period for claims based on Turtle Wax's breaches in 2001 and 2002 expired in January 2006 and January 2007 (respectively), before Plaintiffs' filed their Complaint in state court in March 2007. As a result, Plaintiffs' claims that Turtle Wax breached its promise to purchase $400,000 worth of TD line products in 2001 and 2002 are therefore time barred.

Plaintiffs also claim that Turtle Wax breached its promise to purchase $400,000 worth of TD line product in 2003 by purchasing only $90,000 worth of TD line product and in 2004 by purchasing only $13,000 worth of this product. *See* Doc. #2 at ¶35. These claim are not time barred because Plaintiffs did not gain knowledge of the breach until the close of 2003 or early 2004 (for the 2003 claim) and by 2004 or early 2005 (for the 2004 claim. Adding four years to those accrual dates results in the conclusion that

23

Plaintiffs Complaint, filed in March 2007, was well within Ohio's four-year statute of limitations.

Plaintiffs' remaining breach of contract claim related to the sale of TD line products is based on the allegation that "sometime in 2005" Turtle Wax discontinued this line of products.  (Doc. #2 at ¶35).  At the earliest, Plaintiffs knew about this breach sometime in 2005.  Plaintiffs filed this breach of contract claim within four years by including it in their March 2007 Complaint.

**5.**
**Auto Chem Purchase Contract**

Plaintiffs' breach of contract claims, as set forth in Counts VI and VII of the Complaint, do not specifically discuss Turtle Wax's decision not to buy Auto Chem. *See* Doc. #2 at ¶68-77.  Plaintiffs' factual allegations, which are incorporated into both Counts VI and VII, state in pertinent part:

> In fact, on or around January 2000, Turtle Wax's Vice President of the Industrial Division, Gibney, specifically requested information from Turtle Wax's own principals toward the possibility of purchasing Auto Chem.  Turtle Wax, through Wingert, thereafter communicated [this] potentiality to Culpepper.  In response, Culpepper provided sensitive Auto Chem company financial information for that purpose.  Thereafter, and expressly acknowledging Auto Chem's value to Turtle Wax, Wingert discussed Turtle Wax's possible purchase of Auto Chem with Culpepper on a number of occasions.

(Doc. #2 at ¶26).

Turtle Wax contends that Plaintiffs should have known shortly after January 2000 that Turtle Wax did not plan to purchase Auto Chem.  While Turtle Wax might eventually

24

be able to establish this with evidence outside the Complaint, the allegations of the Complaint do not clearly establish a date when Plaintiffs' knew or reasonably should have known about Turtle Wax's decision not to buy Auto Chem. This is so because Plaintiffs allege that Wingert and Culpepper discussed the possible purchase on many occasions with specifying a date or time when these discussions would have led to a reasonable person to believe that Turtle Wax had decided not to purchase Auto Chem. Without a more specific date or time frame, it does not clearly appear from the face of the Complaint that this claim is time barred. *See Brooks*, 85 F.3d at 181.

Accordingly, Rule 12(b)(6) does not authorize dismissal of this claim as barred by the statute of limitations.

### 6.
### Partnership Contract

Turtle Wax contends that Plaintiff had constructive notice as of January 19, 2001 that any promised partnership between the parties was over because by this time Turtle Wax had discontinued its involvement with the SPS line and had drastically reduced its forecasted purchases of the TD line. (Doc. #10 at 7-10). This contention may eventually help Turtle Wax establish that Plaintiffs' claim that Turtle Wax breached the parties' partnership contract is time barred. But, focusing on the Complaint, Plaintiffs allege that Turtle Wax continued its efforts in the purported partnership well after discontinuing the SPS line.

Plaintiffs allege, "from January through March 2001, Auto Chem and Turtle Wax

intensely discussed continued product development, marketing and distribution absent the SPS line. Despite Turtle Wax's discontinuation of the SPS product, Healey nevertheless affirmed Turtle Wax's commitment to the TD line, and reassured Auto Chem of Turtle Wax's continuing commitment to it...." (Doc. #2 at ¶31). The next paragraph in the Complaint contains further allegations indicating that during Plaintiff Culpepper's continuing activities to maintain Turtle Wax's customer base, Healey told him to stop trying to sell the SPS line "and to switch his efforts exclusively to the TD line on Turtle Wax's behalf." *Id*. at ¶32. And, according to the Complaint, "Auto Chem has never been officially terminated ad supplier or exclusive manufacturer of Turtle Wax's TD line although..., that line was apparently discontinued by Turtle Wax sometime in 2005, and without Auto Chem's input, knowledge or consent." *Id*. at ¶ 35. In the above manner, the Complaint raises sufficient allegations to establish that Turtle Wax did not finally breach the parties' partnership agreement until sometime after March 26, 2001. As a result, the Complaint sufficiently shows that Plaintiffs' claim for breach of partnership contract claim was timely filed on March 26, 2007.

**7.**
**Express Written Contract**

Plaintiffs contends that their breach of written contract claims are not barred by Ohio's fifteen-year statute of limitations. Plaintiffs further assert that discovery will illuminate the existence of sufficient writings to satisfy Ohio's statute of frauds and thus to establish their breach of written contract claims. *See* Doc. #11 at 2-3.

26

Considering only Plaintiffs' claim for breach of purchase contract, Ohio's four-year statute of limitations applies to this claim under Ohio Rev. Code §1302.98(A) regardless of whether the parties' contract was in writing. This is so because the plain and unambiguous language of Ohio's fifteen-year statute of limitations specifically excludes contracts for sales from its protections. *See* Ohio Rev. Code §2305.06.

Turtle Wax contends that Ohio's fifteen-year limitations does not help Plaintiffs avoid their time problems, because the Complaint fails to sufficiently allege the existence of a written contract and it must therefore be assumed that no such contract exists. Turtle Wax reasons, "[p]ursuant to well-established Sixth Circuit and Ohio law, Plaintiffs' failure to reference or attach any written agreement is tantamount to an admission that no such agreement exists." (Doc. #13 at 6). Turtle Wax's arguments lack merit.

Turtle Wax's arguments lose their handle on Rule 12(b)(6) by essentially relying on its own version of the facts rather than construing Plaintiffs' allegations in Plaintiffs' favor. The issue presented by these statute-of-limitations arguments is not whether an actual writing exists but whether the Complaint <u>adequately pleads</u> the existence of a written agreement between the parties. If adequately pled, the breach of written contract claim is timely filed within Ohio's fifteen-year statute of limitations. The analysis thus turns again to the Complaint.

Plaintiffs' Complaint does not specifically refer to a written contract between the parties, and Count VI – Breach of Express Contract – omits any mention of whether the express contract was verbal or written. *See* Doc. #2 at 15. Yet construing the Complaint

27

in the light most favorable to Plaintiffs – as the Court must at this point, *see Eidson*, 510 F.3d at 634 – Plaintiffs' Count VI includes a breach of express written contract and/or breach express verbal contract first because it does not specifically exclude either type of contract and second because the Complaint raises many specific factual details. Construing those factual details in Plaintiffs' favor, *see id*., Count VI of the Complaint sufficiently raises a non-speculative claim that Turtle Wax breached the parties' express written and/or oral agreement(s). *See Eidson*, 510 F.3d at 634-37. Consequently, to the extent Count VI of the Complaint raises a breach of written contract claim, it is not barred by Ohio's fifteen-year statute of limitations and is not subject to dismissal under Rule 12(b)(6).

Turtle Wax contends otherwise by relying on the following oft-quoted statement in *Shied v. Fanny Farmer Candy Shops, Inc*., 859 F.2d 434 (6th Cir. 1987): "when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." 859 F.2d at 437. While this is certainly a well-accepted principal of Rule 12(b)(6) law, *Scheid* does not go as far as Turtle Wax hopes, because it does not mandate a party claiming the breach of a written contract to specifically plead the existence of a written contract. Instead, the omitted facts in *Scheid*, an age-discrimination case, concerned any facts indicating that a younger employee replaced the plaintiff or other facts indicating that age played a factor in the decision to terminate the plaintiff's employment. 859 F.2d at 437. In the present case, the Complaint contains a detailed, non-conclusory recitation of supporting facts that are sufficient to

raise a plausible, non-speculative claim that Turtle Wax breached an express contract, regardless of whether it was verbal or written. Reading the Complaint otherwise would require adopting Turtle Wax's – not Plaintiffs' – construction, an analytical approach that must be carefully assessed since Turtle Wax seeks dismissal of this claims as a means of avoiding the lengthy, fifteen-year statute of limitations applicable to breach of written contract claims in Ohio. *See Eidson*, 510 F.3d at 634-37.

Turtle Wax also relies on *Landskroner v. Landskroner*, 154 Ohio App.3d 471 (2003), a case involving Ohio R. Civ. P. 10(D), which required the plaintiff to attach a copy of the allegedly breached written instrument to the Complaint. 154 Ohio App.3d at 481-82. Turtle Wax does not point to a similar federal Rule and the present version of Fed. R. Civ. P. 10 does not have a similar mandate. Because the Federal Rules of Civil Procedure apply in the present diversity case, the basis for rejecting the breach of written contract claim in *Landskroner* does not require a similar dismissal under Fed. R. Civ. P. 12(b)(6) in the present case.

Turtle Wax also contend that Plaintiffs are attempting to recast or interpret their Complaint to include a claim for breach of contract. (Doc. #13 at 6). This contention lacks merit because Plaintiffs' Count VII claims breach of express contract and because such contracts can be either verbal or written.

Accordingly, to the extent Count VII – breach of express contract – rests on the existence of an express written contract between the parties, this claim is not barred by Ohio's fifteen year statute of limitations.

**C.      Counts VI and VII: Breach of Contract – Remaining Arguments**

**1.**
**Statute of Frauds**

Ohio's statute of frauds provides in part, "No action shall be brought ... upon an agreement that is not to be performed within one year from the making thereof ... unless the agreement upon which such action is brought ... is in writing and signed by the party to be charged therewith...."  Ohio Rev. Code §1335.05.

Turtle Wax contends that Ohio's statute of frauds bars Plaintiffs' breach of contract claim reasoning in two parts: first, because Plaintiff did not attach any written contract to the Compliant or allege that a written contract exists, the Court must infer that the alleged contract is oral (Doc. #10 at 10); and second, because the alleged oral contracts could not be performed within one year, the statute of frauds bars Plaintiffs' contract claims.  *Id.* at 10-11.

According to the Complaint, the agreement between Plaintiffs and Turtle Wax contemplates sales for the next three years, but because the sales for each year are separable, and therefore because a year's sales must be completed within the course of 12 months, the individual claims are not barred by the statute of frauds.

The Court's prior analysis, *supra*, §IV(B), was undertaken without regard to Plaintiffs' near-acknowledgment that they presently cannot produce a written contract in support of their breach of express contract claim.  Plaintiffs' near-acknowledgment arises in their Memorandum where they respond to Turtle Wax's statute of frauds affirmative

defense.  Plaintiffs state:

> facts mitigating against the application of the Statute of Frauds here..., will be developed at trial through both voluminous documents exchanged between the parties during their eleven-plus-year partnership, as well as through witness testimony relating to those documents.  Alternatively, those same documents and testimony may well demonstrate *compliance* with any applicable Statute of Frauds.

(Doc. #11 at 3)(footnotes omitted).  In a footnote, Plaintiffs give examples of the written documents that they believe may comply with the statute of frauds as including "Turtle Wax's own less formal records, such as its minutes, meeting minutes, resolutions, memoranda, or signed notes..."  (Doc. #11 at n.7).  This aspect of Plaintiffs' Memorandum suggests that there is no single written document setting forth the parties' agreement.

Thus, although Plaintiffs acknowledge that no single written document exists in satisfaction of the statute of frauds, they allege that several documents exist that when combined will satisfy the statute of frauds.  Whether or not this theory holds up is thus a question of what affirmative evidence exists in support of this claim – a question not answerable when ruling on a Rule 12(b)(6) motion.

Accordingly, Plaintiff's breach of express contract claim should not be dismissed at this point in the case based on the statute of frauds.

**2.**
**<u>Unjust Enrichment</u>**

Turtle Wax argues that the Complaint fails to state an unjust enrichment or breach of an implied-in-law contract claim because Plaintiffs also allege the existence of an

express agreements or promises between the parties covering the same subject matter.

(Doc. #10 at 17-18). At this early stage of the case, Turtle Wax's argument lack merit

since Fed. R. Civ. P. 8(a)(3) permits Plaintiffs to plead alternative claims for relief.

### D. Counts II and III: Fraud

#### 1.
#### Plaintiffs' Claims

Plaintiffs describe their fraud claims as follows:

**Fraudulent misrepresentation**: "Turtle Wax represented to Plaintiffs that they were partners in the development, sales and marketing of the SPS and TD lines. More specifically, and at all relevant times, Turtle Wax represented to Plaintiffs that if Plaintiffs undertook the research and development of both the SPS and TD lines of professional auto appearance products for Turtle Wax, that Turtle Wax would make Plaintiffs Turtle Wax's primary supplier of those (and other) products, and to support those representations, supplied Plaintiffs with, among other information, forecasts of expected annual sales of both the SPS and TD lines from Auto Chem to Turtle Wax. By fraudulently misrepresenting the nature and extent of Turtle Wax's relationship with, and commitment(s) to Plaintiffs, Turtle Wax was able to secure for its own use Culpepper's proprietary industry contacts, extensive knowledge of the industry, and particularized knowledge of the industry's marketing relationships, all to Turtle Wax's great benefit. These representations, however, were false in that Turtle Wax had no intention of fulfilling its represented annual purchases of either, or both of, the two lines...." (Doc. #2 at 16-17).

**Fraudulent Concealment**: Turtle Wax "never intended to fulfill the several and repeated representations to Plaintiffs that Turtle Wax made regarding the parties' partnership together.... Among other concealment, Turtle Wax concealed from Plaintiffs that Turtle Wax never intended to fulfill their representations to Plaintiffs to purchase certain amounts of developed product, including either and/or both the SPS or TD lines. Turtle Wax had a duty to disclose that information to Plaintiffs in a timely manner." (Doc. #2 at 17-18). In addition, Turtle Wax hid its plan to never buy Auto Chem and Turtle Wax's "decision to terminate their partnership

with Plaintiffs while still availing themselves of, and using, the substantial industry benefit conferred on Turtle Wax by Plaintiffs." *Id*. at 18.

## 2.
## Forecasts vs. Misrepresentations

Turtle Wax contends that the Complaint fails to state claims of fraudulent misrepresentation and fraudulent concealment because these claims are not based on allegedly misrepresented past or existing facts but instead rest on Turtle Wax's future sales forecasts.

Fraudulent misrepresentation in Ohio consists of the following:

'(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.'

*Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 562 at n.4 (6th Cir. 2007)(quoting in part *Burr v. Stark County Bd. of Comm'rs,* 23 Ohio St.3d 69, 491 N.E.2d 1101, 1102 (1986) (paragraph two of the syllabus)).

Turtle Wax is generally correct in asserting that fraud in Ohio "cannot be based on a misrepresentation concerning a future event." *Stancik v. CNBC*, 420 F.Supp.2d 800, 806-07 (N.D. Ohio 2006). But, "'Mere predictions about the future, expectations, or opinions are not fraudulent misrepresentations unless [they] are fraudulently made.'" *Id*. (brackets in *Stanik*) (quoting *Link v. Leadworks Corp*., 79 Ohio App.3d 735, at 742

33

(1992)(other citation omitted).

Plaintiffs' Complaint provides sufficient factual allegations to demonstrate that Turtle Wax intentionally misrepresented its intention to purchase amounts of products in the SPS and TD lines along with other intentional misstatements for the purpose of learning Plaintiffs' proprietary business information. Key to understanding this allegedly fraudulent scheme is thus not only Turtle Wax mere predictions of future product purchases but other intentionally false statement – made in the then-present time – for the purpose of convincing Plaintiff Culpepper that Turtle Wax was fully committed to a mutually beneficial business relationship with Plaintiffs.

For example, Plaintiffs allege that in late 2000, Thomas Healey (Vice President of Turtle Wax's Industrial Division) encouraged Plaintiff Culpepper to "push" Turtle Wax products – including products in addition to Plaintiffs' products – to his client base. At this time, according to Plaintiffs, Healey was already planning to discontinue the SPS line of products "and needed Culpepper's contacts and customer base to introduce Turtle Wax's TD and other, non-Auto Chem developed products to them...." (Doc. #2 at ¶29). But Healey failed to disclose this to Plaintiffs. *Id.* In addition, after Turtle Wax cancelled the SPS line, it affirmed its commitment to the TD line, and reassured Auto Chem of its continuing commitment to it. *Id.* at ¶31. Healy also later told Culpepper to stop his effort to sell the SPS line products elsewhere "and to switch his efforts exclusively to the TD line on Turtle Wax's behalf." *Id.* at ¶32. On January 19, 2001, "Healey told Culpepper that Turtle Wax was going to continue to purchase the TD line for its Industrial

34

Division's car wash distributors, as well as Turtle Wax's own car washes and detailing centers, from Auto Chem." *Id*. at ¶9. It was thus in the context of these alleged misrepresentations that "Turtle Wax principals told Auto Chem that Auto Chem could expect annual, recurring purchases totaling at least $400,000 per annum.... Healey later again affirmed this specific commitment to the TD line on May 9, 2001." *Id*. at ¶s 33-34.

These allegations – if true – are sufficiently specific to demonstrate that Turtle Wax's forecasted purchases were fraudulently made. Consequently, Plaintiffs' Complaint states a claim for fraudulent misrepresentation and fraudulent concealment.

Turtle Wax contends that its sales forecasts were no different than the intentionally inflated volume estimates in *Micrel, Inc. v. TRW, Inc*., 2005 WL 1176057 (N.D. Ohio 2005), which were dismissed as unreasonable as a matter of law. *Micrel*, however, is factually distinguished from the present case for several reasons. First, the fraud claim in *Micrel* was dismissed at the summary-judgment stage, not based on the allegations of the Complaint, which presumably would have indicated that the fraud claim was based on estimated future purchases. Second, certain undisputed facts in *Micrel* – again, a summary-judgment case – showed the defendant continued to pay the plaintiff higher prices (amounting to millions of dollars annually) thus revealing that the plaintiff "cannot claim that it was induced to enter the 2001 Agreements on the basis of artificially inflated figures." 2005 WL at *8. No similar allegations appear in this case; instead the facts alleged show that Turtle Wax fraudulently inflated their forecasted purchases for the purpose of obtaining Plaintiffs' proprietary business information.

35

Third, documents in *Micrel* revealed that the defendant's estimates were based on historic purchasing levels for certain products and "were estimates only." *Id*. In the present case, Turtle Wax promised to annual buy "<u>at least</u> $400,000 per annum" of TD line products. (Doc. #2 at ¶33)(emphasis added). The phrase "at least" identify Turtle Wax's false promise to annually buy <u>$400,000 or more</u> TD line products but not less than $400,000. Thus, unlike the undisputed *Micrel* facts, Turtle Wax's promise to annually purchase at least $400,000 worth of TD line products, when considered in light of the lower amounts of actual annual purchases by Turtle Wax once it obtained what it was after – Plaintiffs' proprietary information – is sufficient to show Turtle Wax's forecasted purchases were fraudulently made. In other words, based on the Complaint, Turtle Wax's estimates were not mere estimates – they were fraudulent statements by Turtle Wax given with the intent to further its fraudulent scheme to obtain Plaintiffs' proprietary business information. This case thus presents the type of valid fraud claim acknowledged by the District Court in *Micrel*, as explained later by the Court of Appeals in *Micrel*, "a promise made with a present intention not to perform constitutes a misrepresentation of existing fact even if the promised performance is to occur in the future." *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 874 (6th Cir. 2007).

**3.**
**Fraudulent Concealment**

Turtle Wax contents that Plaintiffs fraudulent concealment claim fails for lack the

degree of specificity required under Fed. R. Civ. P. 9(b).[4] Turtle Wax reasons that Plaintiffs have failed to allege facts sufficient to show that Turtle Wax had the duty to speak about matters it allegedly kept secret.

If a plaintiff bases a fraud claim on the defendant's act of concealing a material fact, "plaintiffs must also allege an underlying duty to speak for the nondisclosure to be actionable....  The duty to speak may arise where, because of one party's position, a second party reposes confidence in the first party, who, in turn, learns of the confidence being placed in it." *Randleman v. Fidelity Nat. Title Ins. Co*., 465 F.Supp.2d 812, 822 (N.D. Ohio 2006)(citing *Schulman v. Wolske & Blue Co., L.P.A.,* 125 Ohio App.3d 365, 372, 708 N.E.2d 753 (1998)).

"Ordinarily in business transactions under where parties deal at arm's length, each party is presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other."  *Blon v. Banc One, Akron, N.A*., 35 Ohio St.3d 98, 101 (1988).  Several exceptions to presumptions exist, *see id*., at least one of which potentially applies in the present case.  As Turtle Wax correctly acknowledges, a duty to speak may arise "when disclosure is necessary to dispel misleading impressions that are or might have been created by a partial revelation of the facts."  (Doc. #10 at 16)(citing *Blon*, 35 Ohio St.3d

---

[4]  Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to "state with particularity the circumstances constituting fraud.  To satisfy Rule 9(b)'s specificity requirement, "a plaintiff, at a minimum, [must] 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993).

98, 101, 519 N.E.2d 363, 367 (1988)).

The facts alleged in the Complaint are sufficient to show that Turtle Wax repeatedly misrepresented its commitment to Plaintiffs in a manner designed to give Plaintiffs the wrong impression – that Turtle Wax actually wanted to engage in a mutually beneficial business relationship, when in fact it only wanted to obtain Plaintiffs' proprietary business information for its own benefit. Consequently, the Complaint raises sufficiently specific allegations to demonstrate that Turtle Wax concealed material facts that it had a duty to disclose.

### 4.
### Statute of Limitations

Turtle Wax contends that Plaintiffs' fraud claims are barred by Ohio's four-year statute of limitations.

The parties do not dispute that a four-year statute of limitations applies to fraud claims brought in Ohio. *See* Ohio Rev. Code §2305.09. Because Plaintiffs filed their Complaint in state court on March 26, 2007, to be timely, their fraud claims must have accrued on or after March 26, 2003.

The general accrual rule in Ohio provides: "a cause of action accrues and the statute of limitations begins to run at the time the wrongful act was committed." *Collins v. Sotka,* 81 Ohio St.3d 506, 507-08 (1998)(citation omitted). This general rule is tempered by an exception – the discovery rule – which states:

> [A] cause of action accrues when the plaintiff discovers, or in the exercise of reasonable care should have discovered, that he or she was

38

> injured by the wrongful conduct of the defendant....  In essence, the running
> of the limitations period is delayed until triggered by a 'cognizable event'
> that alerts the plaintiff that he or she was injured by the defendant.

*Collins*, 81 Ohio St.3d at 507-08 (citations omitted).

A fraud claim accrues in Ohio when "the fraud was or should have been

discovered.  No more than a reasonable opportunity to discover the fraud is required to

start the period of limitation....  Information sufficient to alert a reasonable person to the

possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due

diligence....  Once sufficient indicia of fraud are shown, a party cannot rely on its

awareness or the efforts of the opposition to lull it into a false sense of security to toll the

statute."  *Au Rustproofing Center, Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir.

1985); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 422 (6th Cir.

1995).

Turtle Wax contends that Ohio's four-year statute of limitations bars Plaintiffs'

fraud claims because they accrued on or near three separate dates:

1.  In January 2000 when Turtle Wax drastically reduced its revenue forecasts
    regarding the SPS and TD lines.

2.  On January 19, 2001 when Auto Chem knew that Turtle Wax had cancelled
    the sale of the SPS line.

3.  At the end of 2001, when Plaintiffs knew that Turtle Wax total purchases of
    the TD line from Auto Chem were only $165,000, far less than the forecast
    of $400,000 in yearly sales.

(Doc. #13 at 7)(citing Complaint, ¶¶ 17, 23, 27, 30, 33, 35).

Plaintiffs' fraud claims arise from their allegations that Turtle Wax misrepresented

the nature and extent of its commitment to Plaintiffs in order to secure for its own use Plaintiff Culpepper's proprietary business information (his industry contacts, his particularized knowledge of the industry's marketing relationships, etc.), and despite these false representations Turtle Wax never intended to fulfill its "its represented annual purchases" of the TD or SPS lines.  (Doc. #2, ¶s 45-46).

Pinpointing a specific accrual date is notably difficult at this early stage in the case because Plaintiffs' fraud claims concern alleged misconduct over a lengthy period of time during which the parties engaged in what appeared to be ordinary business activities and during which Turtle Wax hid fraudulent scheme from Plaintiffs.  According the Complaint, most of Turtle Wax's alleged misrepresentations occurred before 2003 during the parties' many and frequent discussions of matters related to the TD and SPS lines. Under Plaintiffs' theory, then, in order to advance this fraudulent scheme during this time, Turtle Wax had to walk and talk as if it truly sought to maintain, if not enhance, the parties' mutually beneficial business relationship.  *See* Doc. #2, ¶s 7-30.  It is reasonable to read the Complaint as alleging that Turtle Wax held a secret intent to defraud Plaintiffs throughout the late 1990s, into 2000, and through the next few years.  The Complaint thus sets forth no specific single watershed communication when Turtle Wax's fraudulent scheme became apparent before March 26, 2003.  And, as a result, Turtle Wax's three proposed accrual dates did not alert Plaintiffs, and would not have alerted a reasonable person in Plaintiffs' position, that Turtle Wax was engaged in a fraudulent scheme to obtain Plaintiffs' proprietary business information before March 26, 2003.

40

Turtle Wax's pre-2000 representations about the TD and SPS lines of product –
including Turtle Wax's revenue forecasts provided in 1998 or 1999 – provided no
indication that Turtle Wax did not intend to fulfill its promises or representations with
regard to the sales of the TD or SPS lines.  *See* Doc. #1, ¶s17-26.  By itself, the act of
making revenue forecasts is a mundane business activity.  Similarly, the events that
occurred during the year 2000, as alleged in the Complaint, did not alert Plaintiffs, and
would not have alerted a reasonable person, that Turtle Wax was engaging in fraud.
Instead, Turtle Wax spoke and acted as if it truly wanted the TD and SPS lines to succeed
with no notably suspicious representations or behavior.

Although business trouble began to emerge in January 2000 when Turtle Wax
lowered its sales forecasts regarding its purchases of the TD and SPS lines to the
projected figure of $1.2, *see* Doc. #1, ¶27, the Complaint fails to raise an allegation that
provided notice to Plaintiffs, or would have provided notice to a reasonable person, of
fraud.  Similarly, although Plaintiffs allege that by late 2000 Turtle Wax was planning to
discontinue the SPS line, a plan it hid from Plaintiffs, *see* Doc. #1, ¶29, this at most hinted
that the parties had reached an unprofitable deal about the SPS line – not that Turtle Wax
was engaging in fraud.

The next possible accrual event occurred – based on the Complaint's allegations –
on January 19, 2001 when Turtle Wax informed Plaintiff Auto Chem that it "would
discontinue the sale of the SPS line."  (Doc. #2, ¶30).  This again failed to provide
Plaintiffs with notice of fraud and would not have provided a reasonable person with such

notice. This is so, even in light of Turtle Wax's 1998/1999 forecasts, its subsequent reduction in forecasts, and its failure in 2000 to inform Plaintiffs of its plan to discontinue the SPS line, since Turtle Wax continued to purchase the TD line in a manner consistent with its legitimate-appearing business activities. Assuming, as Plaintiffs claim, that Turtle Wax's fraudulent scheme was fully operational, Turtle Wax's conduct and communications to Plaintiffs merely indicated the existence of inaccurate early revenue forecasts along with an unprofitable deal regarding the SPS line. Nothing in these allegations would have alerted a reasonable person of the fraud.

Next, Plaintiffs knew at end of 2001 that Turtle Wax's total purchases of the TD line from Auto Chem were only $165,000, far less than the forecast of $400,000 in yearly sales. Combining this knowledge with Plaintiffs' knowledge of the above events, there is again little to indicate anything more than a bad business deal. Without some additional allegation or fact, these events gave little inkling to Plaintiffs that Turtle Wax was engaged in an ongoing fraudulent scheme to obtain Plaintiffs' proprietary information while providing nothing of value in return.

Two additional points must be made: First, discovery in this case may (or may not) reveal the occurrence of other events before Turtle Wax's presently proposed accrual dates that would have alerted a reasonable person in Plaintiffs' position that Turtle Wax was engaged in a fraudulent scheme. Because review at this early stage of the case is circumscribed by the allegations of the Complaint, Turtle Wax has not met its burden of showing Plaintiffs' fraud claims are time barred. *See* Fed. R. Civ. P. 9(c); *e.g., FDIC v.*

42

*Alexander*, 78 F.3d 1103, 1107 (6th Cir. 1996). Second, the Court notes that Plaintiffs' proposed accrual date – June 15, 2004, when their then-attorney sent a letter to Turtle Wax, *see* Doc. #11 at 2 – lacks merit. Plaintiffs' proposed date merely reveals that by June 15, 2004 they had gained actual knowledge of the fraudulent scheme, as indicated by their then-counsel's letter. The letter does not extinguish the possibility earlier events provided Plaintiffs with actual knowledge of the fraudulent scheme or earlier events would have alerted a reasonable person in their position about Turtle Wax's fraudulent scheme.

Accordingly, accepting as true the allegations in the Complaint, the parties' proposed accrual dates lack merit at this early stage of the case. Dismissal of Plaintiffs' fraud claims as time barred is therefore presently unwarranted.

## V.    SUMMARY

Plaintiffs' promissory estoppel claim and breach of implied-in-law contract claim are time barred to the extent the concern events that occurred before March 26, 2001. These claims are not time barred to the extent they concern events that occurred on or after March 26, 2001.

Plaintiffs' breach of contract claims are dismissed in part as follows:

1.    Plaintiffs' claims based on Turtle Wax's failure to purchase the definite dollar amounts of SPS and TD line products are time barred.

2.    Plaintiffs' claims regarding Turtle Wax's discontinuation of the SPS line of products are time barred.

3.    Plaintiffs' claims that Turtle Wax breached its promise to purchase

43

$400,000 worth of TD line product in 2001 and 2002 are time barred.

4.      Plaintiffs' claim that Turtle Wax breached the parties' contract by failing to purchase Auto Chem is time barred.

Plaintiffs' remaining contract claims are not time barred.

Plaintiffs' claim for breach of express written contract is not barred by the statute of frauds at this stage of the case.

Plaintiffs' claim of unjust enrichment is not precluded by the presence of Plaintiffs' breach of express contract claims, because the Complaint pleads these as alternative claims.

Plaintiffs' Complaint states claims for relief based on fraudulent misrepresentation claim and fraudulent concealment, and these claims are not time barred at this stage of the case.

### IT IS THEREFORE RECOMMENDED THAT:

1.      Defendant Turtle Wax's Motion to Dismiss Plaintiffs' Complaint (Doc. #10) be GRANTED in part and denied in part as summarized in Section V;

2.      Plaintiffs' Motion to Strike (Doc. #14) Defendants' Reply be DENIED since the additional and untimely matters raised in therein work no prejudice to Plaintiffs; and

3.      Plaintiffs' Motion for In Camera Inspection (Doc. #20) be DENIED as moot.

July 31, 2008

                    s/ Sharon L. Ovington
                    Sharon L. Ovington
                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Amended Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Amended Report is being served by mail.  Such objections shall specify the portions of the Amended Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Amended Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).