IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


AUTO CHEM LABORATORIES, INC.,   :
 *et al.,*
         Plaintiffs,     :
                        Case No. 3:07-cv-156
    vs.              :
                        JUDGE WALTER HERBERT RICE
TURTLE WAX, INC.,         :

         Defendant     :

---

DECISION AND ENTRY SUSTAINING DEFENDANT TURTLE WAX'S
MOTION FOR SUMMARY JUDGMENT (DOC. #76); JUDGMENT TO
ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFFS;
TERMINATION ENTRY

---

Plaintiffs, Auto Chem Laboratories, Inc., ProCraft Industries, Inc., and Bruce

K. Culpepper, filed suit in state court against Turtle Wax, Inc., asserting a wide

variety of state law claims arising out of a failed business relationship.  Turtle Wax

removed the case to federal court based on diversity of citizenship.

The Second Amended Complaint, Doc. #56, includes claims of promissory

estoppel, fraudulent misrepresentation, fraudulent concealment, breach of implied

contract/constructive contract/unjust enrichment, breach of express contract, and

conversion.  Some of these claims, however, were voluntarily dismissed by

Plaintiffs and others were dismissed by the Court.  The only remaining claims are:

(1) fraudulent misrepresentation; (2) fraudulent concealment; and (3) unjust enrichment. *See* Doc. #70, at 3 n.1.[1] This matter is currently before the Court on Defendant's Motion for Summary Judgment on those three remaining claims. Doc. #76.

## I.    Background and Procedural History[2]

Defendant Turtle Wax manufactures and sells auto appearance and cleaning products. In 1989, Plaintiff Auto Chem began supplying Turtle Wax with various Auto Chem brand professional auto appearance products. Culpepper Dep. at 39.

In 1993, Turtle Wax approached Plaintiff Bruce Culpepper, President of Auto Chem, about partnering with Turtle Wax to develop, manufacture, market, and distribute a private line of auto appearance products that came to be known as the Super PolyShell or "SPS" line. The alleged "partnership" agreement was never reduced to writing. As Culpepper understood it, however, he would develop the product line for car dealers and provide marketing support and industry contacts. In return, Auto Chem would be the exclusive manufacturer of the Turtle Wax SPS line, and Turtle Wax would make a commitment to purchase and resell a certain

---

[1]  Plaintiffs' Memorandum in Opposition also discusses the breach of contract claim. Doc. #81, at 15-16. However, the Court has previously dismissed this claim as barred by the Statute of Frauds. Doc. #32, at 25.

[2]  As required on a motion for summary judgment, the Court views the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

volume of SPS products each year. *Id.* at 40-49.

In May of 1997, Culpepper entered into a 6-month consulting agreement with Turtle Wax to provide marketing services for the SPS line. *Id.* at 43-44. He was paid $15,000 for his services. *Id.* at 121. When that agreement expired, Culpepper continued to devote the majority of his time to marketing the newly-developed SPS line of products for Turtle Wax. *Id.* at 47-49. He testified that "[w]e basically put all our eggs in one basket." *Id.* at 267. Although Auto Chem lost most of its previous customers, Culpepper decided that his relationship with Turtle Wax had the potential to be much more profitable. *Id.* at 171, 176-81, 266-67. Turtle Wax projected that it would purchase $1.8 million worth of SPS products in 1998, $2.3 million in 1999, and $2.9 million in 2000. *Id.* at 69.

In 1998, Turtle Wax asked Auto Chem to develop a second line of products that became known as the "TD" line, to be marketed to car washes and detail shops. *Id.* at 50-52. Culpepper trained Turtle Wax personnel on the product lines, and continued to provide marketing support. *Id.* at 172. In 2000, Turtle Wax explored the possibility of purchasing Auto Chem, but nothing came of those discussions. *Id.* at 189-90. That same year, Culpepper established Plaintiff ProCraft Industries, Inc., to distribute SPS products for Turtle Wax. *Id.* at 26.

Unfortunately, Turtle Wax's projected purchases of the SPS and TD products fell far short. *Id.* at 69-70. In 2000, because the sales volume was so much less than anticipated, Auto Chem began experiencing great financial difficulty. *Id.* at

3

417-18; Exs. 54, 57 to Culpepper Dep.

On January 19, 2001, Turtle Wax informed Culpepper that it would discontinue sales of the SPS line in May of 2001. Culpepper Dep. at 72-73, 269. Turtle Wax nevertheless assured Culpepper that it was committed to the TD line, and promised total purchases of at least $450,000 per year for the next five years. *Id.* at 72-73. In reliance on this promise, Culpepper continued to use his contacts in the auto industry to market the TD line and other Turtle Wax products to the SPS customer base for a few more months. However, by the middle or end of 2001, Culpepper decided to stop devoting time to Turtle Wax and began developing his own "CarPro" product line. *Id.* at 331-35.

Turtle Wax's actual purchases of TD products continued to be far less than promised. Purchases totaled only $165,000 in 2001, $167,719 in 2002, $90,646 in 2003, and $13,551 in 2004. *Id.* at 454-56. The final purchase was in February of 2004. *Id.* at 241, 443. In the summer of 2004, Culpepper learned from a customer that Turtle Wax planned to close down the TD line altogether in 2005. *Id.* at 494-95. Early in 2006, Auto Chem and ProCraft went out of business. *Id.* at 17-18.

Auto Chem, ProCraft, and Culpepper filed suit against Turtle Wax in state court on March 26, 2007, seeking compensatory and punitive damages. Turtle Wax removed the case to federal court based on diversity of citizenship. Turtle Wax has now moved for summary judgment on the three remaining claims of

4

fraudulent misrepresentation, fraudulent concealment and unjust enrichment. Turtle Wax maintains that the claims are time-barred and that they fail on the merits.

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial."  *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "requires the nonmoving party to go beyond

5

the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for

6

some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992), *cert. denied*, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.  Analysis

### A.  Fraudulent Misrepresentation/Fraudulent Concealment

Count II of the Second Amended Complaint sets forth a claim of fraudulent misrepresentation, and Count III sets forth a claim of fraudulent concealment. Under Ohio law, the elements of fraud are as follows:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709, 712 (Ohio 1987).

In Count II, Plaintiffs allege that Turtle Wax falsely represented "the nature and extent of Turtle Wax's relationship with, and commitment(s) to Plaintiffs."

7

Sec. Am. Compl. ¶ 47.  Turtle Wax allegedly represented that it was a "partner" with Plaintiffs.  Plaintiffs were to undertake the development of the SPS and TD lines.  In exchange, Plaintiffs would be the primary supplier of those products. Turtle Wax supplied Plaintiffs with forecasts of their expected annual sales of those products.  In reliance on those forecasts, Plaintiffs shared proprietary information with Turtle Wax and gave up other business opportunities.  According to Plaintiffs, those representations were false in that Turtle Wax had no intention of fulfilling its promise to purchase the projected amounts.[3]  Sec. Am. Compl. ¶¶ 45-49.

In Count III, Plaintiffs allege that Turtle Wax fraudulently concealed the fact that it never intended to fulfill: (1) its representations concerning the "partnership;" (2) its promises to purchase a certain amount of Plaintiffs' products;  or (3) its representations that it intended to purchase AutoChem from Culpepper.  Sec. Am. Compl. ¶¶ 55-58.

Turtle Wax argues that Plaintiffs' fraud-based claims are barred by the statute of limitations and that they fail on the merits.  Because the Court concludes that these claims are indeed time-barred, the Court does not reach their merits.

---

[3] In their Memorandum in Opposition, Plaintiffs allege that on January 19, 2001, Turtle Wax promised $450,000 in annual purchases of TD line products, knowing that it planned to divest itself of that line.  Doc. #81, at 11.  Plaintiffs point to an internal Turtle Wax memo, dated September 20, 2000, which discusses "another disappointing year" for the SPS and TD product lines and refers to "contingency plans to potentially divest" itself of "some or all" of these product lines.  Ex. 105 to Culpepper Dep.

Pursuant to Ohio Revised Code § 2305.09(C), Plaintiffs' fraud-based claims are subject to a 4-year statute of limitations. Plaintiffs filed suit on March 26, 2007; therefore, any fraud claims that accrued prior to March 26, 2003 are time-barred. Fraud-based claims accrue when the victims "discovered, or should have discovered, the claimed matters." *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206, syl. ¶2b (Ohio 1989). *See also* Ohio Revised Code § 2305.09 (fraud claims do not accrue "until the fraud is discovered."). "No more than a reasonable opportunity to discover the misrepresentation is required to start the period of limitations. Information sufficient to alert a reasonable person to the possibility of wrongdoing gives rise to a party's duty to inquire into the matter with due diligence." *Craggett v. Adell Ins. Agency*, 92 Ohio App.3d 443, 454, 635 N.E.2d 1326, 1333 (Ohio Ct. App. 1993).

The date when the victims discovered or should have discovered the alleged fraud is generally a question of fact to be determined by a jury. However, as with other issues, if there is no genuine issue of material fact, summary judgment is appropriate on statute of limitations grounds. *See, e.g., Hamilton v. Ohio Sav. Bank*, 70 Ohio St.3d 137, 140, 637 N.E.2d 887, 889-90 (Ohio 1994) (finding that genuine issues of material fact precluded summary judgment on question of when plaintiffs discovered or should have discovered the alleged fraud). In this case, reasonable minds could reach just one conclusion. Plaintiffs knew or should have known of the alleged wrongdoing prior to March 26, 2003. All of Plaintiffs' fraud-

based claims are therefore time-barred.

As to Plaintiffs' claims that Turtle Wax made fraudulent representations and concealed the nature of its "partnership" with Plaintiffs, Turtle Wax notes that Plaintiffs have acknowledged that Thomas Healy of Turtle Wax informed them on December 15, 2000, that "Turtle Wax has no intention in supporting Auto Chem as a partner financially." Ex. 65 to Culpepper Dep. Again, on January 31, 2001, Culpepper concluded in a "recap" of a November 15, 2000, meeting that "Turtle Wax has no intention in supporting Auto Chem as a true partner." Ex. 76 to Culpepper Dep.

Culpepper also testified that by the end of 2000, it was obvious to him that Turtle Wax was not committing the resources and manpower needed to market his products. Culpepper Dep. at 331, 396-97. A January 2001 memo acknowledges that Turtle Wax has "lost a lot of money" on the SPS line and "wants to get out." Culpepper Dep. at 303-04; Ex. 62 to Culpepper Dep.

Later in 2001, Plaintiffs expressed concern on several occasions about Turtle Wax's lack of commitment to the TD line. In a letter dated August 22, 2001, Auto Chem's accountant wrote that "[l]ast year it became apparent that the marketing effort by Turtle Wax was not resulting in the expected sales volume." Ex. 86 to Culpepper Dep. In another letter dated August 25, 2001, Culpepper wrote to Tom Healy that recent business decisions made by Turtle Wax had caused Auto Chem tremendous losses. Ex. 87 to Culpepper Dep. Culpepper testified that by the end

10

of 2001, he had ceased his marketing efforts with respect to the TD line because his customers no longer wanted to do business with Turtle Wax. It was at that point that he decided to commit his time and effort into developing CarPro, his own brand of auto appearance products. Culpepper Dep. at 333-34.

As to Plaintiffs' claim that Turtle Wax concealed the fact that it had no intention of purchasing Auto Chem from Culpepper, Culpepper admitted in his deposition that he knew by the end of 2000 that Turtle Wax was not interested in acquiring Auto Chem. Culpepper Dep. at 190. Culpepper also acknowledged this fact in his January 31, 2001, "recap" of the November 15, 2000, meeting with Healy. Ex. 76 to Culpepper Dep.

Finally, as to Plaintiffs' allegation that Turtle Wax made misrepresentations concerning the volume of products it would purchase, and fraudulently concealed the fact that it had no intention of fulfilling that promise, Plaintiffs knew well before March 26, 2003, that Turtle Wax's actual purchase volume was nowhere near what was projected. Plaintiffs also knew that Turtle Wax was not committing enough resources or marketing efforts to meet its projected purchase volume.

In January of 2001, Gary Buck, Auto Chem's one other shareholder, was preparing for a meeting with Tom Healy. With respect to Turtle Wax's annual use projections for the TD line, Buck wrote, "Caution! Their projections have never been even close to accurate." Ex. 62 to Culpepper Dep.; Culpepper Dep. at 301-02. Moreover, Culpepper testified that he knew at the end of each year from 1998

11

through 2004, that Turtle Wax had fallen far short of its sales projections. Culpepper Dep. at 76-78. In addition, as noted earlier, by August of 2001, Plaintiffs recognized that Turtle Wax was not devoting sufficient resources or marketing efforts to produce the projected sales volume. From this evidence, it can be inferred that Plaintiffs knew, no later than March 26, 2003, that Turtle Wax had no intention of keeping its promise to purchase a certain volume of Plaintiffs' products. No competing inferences exist.

Plaintiffs, in fact, do not dispute that they were well aware of all of this alleged wrongdoing prior to March 26, 2003. They argue, however, that the statute of limitations was "tolled" until the summer of 2004, when Culpepper learned through a customer that Turtle Wax planned to discontinue the TD line. Plaintiffs maintain that Turtle Wax had strung them along for years, knowing that Plaintiffs were dependent on Turtle Wax for survival and would not sue so long as Turtle Wax continued to purchase products from them. According to Plaintiffs, suing Turtle Wax would have been "the death knell for Auto Chem." They maintain that the "proverbial last straw" was learning that Turtle Wax was planning to discontinue the TD line altogether. Doc. #81, at 11.

Plaintiffs offer absolutely no authority to support their argument that the statute of limitations was tolled until they learned that Turtle Wax was planning to discontinue the TD line. They apparently want the Court to adopt a rule that the statute of limitations on a fraud claim against a business "partner" does not begin

12

to run until that business relationship has come to a complete end. That, however, is not the law. As noted above, fraud claims accrue when the victims discovered, or should have discovered, the alleged wrongdoing.[4]

In this case, the undisputed evidence shows that long before March 26, 2003, Plaintiffs knew or should have known that Turtle Wax did not view Plaintiffs as "partners," that Turtle Wax had no intention of purchasing Auto Chem, and that Turtle Wax had no intention of purchasing the volume of products originally projected. No later than the end of 2001, Plaintiffs were alerted to the possibility of wrongdoing, yet they took no action to protect their legal rights. Nothing prevented Plaintiffs from filing suit in a timely manner other than their fear that if they did file suit, their business relationship with Turtle Wax would be damaged beyond repair. Unfortunately, this is not a legally viable defense to Turtle Wax's statute of limitations argument.

The Court finds that Plaintiffs' claims of fraudulent misrepresentation and fraudulent concealment are time-barred. The Court therefore SUSTAINS Defendant's Motion for Summary Judgment on these two claims.

---

[4] The doctrine of equitable estoppel may operate to toll the statute of limitations if the defendant makes a misrepresentation specifically calculated to induce a plaintiff to forego the right to sue. *Hoeppner v. Jess Howard Elec. Co.* (2002), 150 Ohio App.3d 216, 2002-Ohio-6167, 780 N.E.2d 290, at ¶ 43; *Livingston v. Diocese of Cleveland*, 126 Ohio App.3d 299, 314-15, 710 N.E.2d 330, 339 (Ohio Ct. App. 1998). Plaintiffs, however, do not allege that Turtle Wax made any such statement, and do not argue that this doctrine is applicable.

**B.     Unjust Enrichment**

Count IV of Plaintiffs' Second Amended Complaint seeks more than $3 million in restitution for the full value of services Plaintiffs provided to Turtle Wax, including time and money spent on research and product development, development of a distribution company, design of packaging and marketing materials, training Turtle Wax personnel, and disclosure of industry knowledge and contacts.  Sec. Am. Compl. ¶ 63-64.  Turtle Wax argues that this claim is time-barred and that it fails on the merits.

**1.     Statute of Limitations**

Quasi-contractual claims are subject to a 6-year statute of limitations.  *See* Ohio Rev. Code § 2305.07 (governing actions upon a contract not in writing). Plaintiffs filed suit on March 26, 2007; therefore, any claims that accrued prior to March 26, 2001, are time-barred.  "[A] cause of action for unjust enrichment accrues on the date that money is retained under circumstances where it would be unjust to do so."  *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 106 Ohio App.3d 167, 175, 665 N.E.2d 718, 723 (Ohio Ct. App. 1995).  In a case involving services rendered by a physician to a professional diagnostic imaging corporation, one Ohio appellate court held that the unjust enrichment claim accrued on the date he last rendered services to the corporation.  *Desai v. Franklin* (2008), 177 Ohio App.3d 679, 2008-Ohio-3957, 895 N.E.2d 875, at ¶ 22.

Citing *Desai*, Plaintiffs argue that because they continued to sell products to Turtle Wax through February of 2004, the statute of limitations did not begin running until then. But, as Turtle Wax points out, there is a difference between sales and services. Plaintiffs concede that they were paid in full for all products purchased through February of 2004. Instead, their unjust enrichment claim is based on *services* provided to Turtle Wax. Therefore, the Court must determine the last date on which Plaintiffs provided *services* to Turtle Wax.

With respect to the TD product line, Turtle Wax argues that all of the services for which Plaintiffs now seek restitution were provided prior to March 26, 2001.[5] Culpepper testified that the TD line was fully developed and all packaging and marketing design was completed by the end of 2000. Culpepper Dep. at 324-25. ProCraft, the distribution company, was developed in July of 2000. *Id.* at 321-23. Culpepper also testified that after January of 2001, he no longer provided advice to Turtle Wax about sales distribution channels. *Id.* at 342.

If this were the full extent of services rendered, the Court would agree that Plaintiffs' claim of unjust enrichment was time-barred. However, Culpepper also testified that he continued his attempts to sell the TD line and other products for Turtle Wax through the end of 2001. *Id.* at 329, 334. To the extent that he rendered any marketing services after March 26, 2001, this claim must be

---

[5] The Court has already determined that Plaintiffs' claims related to the SPS product line are time-barred. Doc. #32, at 8, 17-18.

considered timely filed.[6]

### 2. Merits

Even though Plaintiffs' unjust enrichment claim was filed within the statute of limitations, it nevertheless fails on the merits. Unjust enrichment occurs when: (1) the plaintiff confers a benefit on the defendant; (2) the defendant knows of the benefit; and (3) the defendant retains the benefit "under circumstances where it would be unjust to do so without payment." *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (Ohio 1984).

A claim for unjust enrichment "arises not only where an expenditure by one person adds to the property of another, but also where the expenditure saves the other from expense or loss." *See Chaney v. Village of Potsdam*, 2d Dist. No. 05CA14, 2005-Ohio-5908, at ¶19. Plaintiffs argue that by relying on them for all research and product development, marketing, training and distribution, Turtle Wax was spared the expense of hiring other people to handle those responsibilities. Plaintiffs maintain that unless they are compensated for the value of these services, Turtle Wax will be unjustly enriched.

---

[6] The Court rejects Turtle Wax's argument that because this portion of the claim relates to the sale of goods, it is subject to the 4-year statute of limitations set forth in Ohio Rev. Code § 1302.98(A), and is time-barred. The 4-year statute of limitations applies only to actions "for breach of any contract for sale." *See* Ohio Rev. Code § 1302.98(A). Plaintiffs' unjust enrichment claim stems from time they spent developing and marketing particular product lines, not from a breach of contract for the sale of those goods. Therefore, the 6-year statute of limitations applies instead.

There is no doubt that Plaintiffs have conferred a benefit on Turtle Wax and that Turtle Wax knows of it. The only question is whether Turtle Wax's retention of the benefit is unjust. In the Court's view, under the circumstances presented here, no reasonable jury could find that it was.

The services for which Plaintiffs now seek compensation were the subject of an oral agreement between the parties. As Turtle Wax points out, it is undisputed that the parties previously agreed that Plaintiffs would be compensated for their efforts *solely* through a $15,000 consulting contract and through Turtle Wax's purchase of the products developed by Plaintiffs. It is also undisputed that Plaintiffs were, in fact, paid the $15,000 and were fully paid for all of the products purchased by Turtle Wax. Culpepper Dep. at 40-49, 121, 605-10. In other words, Plaintiffs have received everything to which they agreed they would be entitled.

The crux of Plaintiffs' unjust enrichment claim is that they invested a great deal of time and effort in this venture, putting "all their eggs in one basket," and hoping that Turtle Wax would purchase enough products to make it all worthwhile. Unfortunately, those expectations fell flat, leaving Plaintiffs with far less than expected.

Turtle Wax argues that just because Plaintiffs were disappointed in the return they received on their investment, this does not give rise to a claim for unjust enrichment. In support, Turtle Wax cites to the case of *Batler, Capitel & Schwartz v. Tapanes*, 517 N.E.2d 1216, 1219 (Ill. Ct. App. 1987), in which the

17

court stated, "[p]arties entering into a contract assume certain risks with the expectation of a beneficial return; however, when such expectations are not realized, they may not turn to a quasi-contract theory for recovery."

The applicability of *Batler* to the facts of this case is doubtful. It is true that if an *enforceable* contract exists and it has not been breached, recovery above and beyond what was contractually agreed upon is not available under an unjust enrichment theory. *See* Restatement (First) of Restitution § 107(1), cmt. a ("a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was agreed between them the other should give in return.")

The instant case, however, does not concern an enforceable contract. This Court previously held that the oral "partnership" agreement at issue did not comply with the Statute of Frauds' requirement that contracts "not to be performed within one year" must be in writing, and was therefore unenforceable. Doc. #32, at 18-25 (citing Ohio Revised Code § 1335.05). Even though Plaintiffs cannot proceed on a breach of contract theory, they are still entitled to restitution for the "reasonable value of the benefits conferred" upon Turtle Wax. As the Court previously held, this amount is limited, however, to "the actual value of the services rendered." Doc. #70, at 21 (quoting *Sonkin & Melena Co., LPA v. Zaransky*, 83 Ohio App.3d 169, 176, 614 N.E.2d 807 (Ohio Ct. App. 1992)).

The relevant question is what effect the parties' oral agreement has on the

18

issue of the "actual value of the services rendered" by Plaintiffs. Even though that

oral agreement has been deemed unenforceable, it is nevertheless admissible to

show the value that the parties placed on the services that were to be provided by

Plaintiffs. *See* 10 *Williston on Contracts* § 27:24 (4th ed.); *Clark v. United States*,

95 U.S. 539, 543 (1877) (where oral contract for use of vessel was

unenforceable, the amount agreed upon by the parties was admissible to show

value of that use); *Mangione v. Braverman*, 199 A.2d 225, 227 (Md. 1964)

(holding that when contract is deemed unenforceable because of Statute of Frauds,

"the contract terms may be shown as evidence that a gift was not intended and as

bearing on the value of the services rendered"); *Miller v. Miller*, 335 S.W.2d 884,

888 (Ky. 1960) ("If the 'quantum' cannot be readily measured in money, then it is

said that the 'contract' may be resorted to . . . as constituting the standard of

value established by the promisor himself.").

    With respect to the measure of restitution available when a contract has

been found unenforceable under the Statute of Frauds, one scholar has noted, "[i]t

has been said, and not infrequently held, that if the plaintiff has fully performed an

oral agreement [even if not enforceable in a Court of law or equity], recovery is

limited to the full contract price." 10 *Williston on Contracts* § 27:24 (4th ed.). For

example, in *Coleman v. Forrester*, 163 S.W. 263, 264 (Mo. Ct. App. 1914), the

court held that the plaintiff could not make an oral contract to sell goods for a

particular price, deliver the goods, and then sue for an increased price on the

19

ground that the contract was unenforceable under the Statute of Frauds. Likewise, in *Weaver v. General Metals Merger*, 9 P.2d 778, 779 (Wash. 1932), the court held that the value of the services performed pursuant to an oral contract, which was unenforceable under of the Statute of Frauds, "is measured by the sum fixed in the contract."

Nevertheless, not all courts are not in agreement on this. *See, e.g.*, *Clark*, 95 U.S. at 543 (holding that evidence of the agreed-upon value was "not binding or conclusive"); *William Butcher Steel Works v. Atkinson*, 68 Ill. 421, 1873 WL 8376, at *2 (Ill. 1873) (holding that a contract deemed void by the Statute of Frauds does not necessarily control the measure of compensation); *Quirk v. Bank of Commerce & Trust Co.*, 244 F. 682, 688 (6th Cir. 1917) (same, interpreting Tennessee and Wisconsin law).

Neither party cites to any Ohio cases addressing this particular topic and the Court has been unable to find any directly on point. However, even if the Court takes the more conservative view -- that evidence of the agreed-upon contract price is neither conclusive nor binding, but is admissible to show the value that both parties placed on Plaintiffs' services -- the Court concludes that Turtle Wax is entitled to summary judgment on Plaintiffs' unjust enrichment claim.

In order to succeed on their claim of unjust enrichment, Plaintiffs must show that they have a "superior equity," making it "unconscionable" for Turtle Wax to retain the benefit without paying for it. *Cincinnati v. Fox*, 71 Ohio App. 233, 239,

49 N.E.2d 69, 73 (Ohio Ct. App. 1943). The Court finds that, under the circumstances presented here, no reasonable jury could find that Plaintiffs have a "superior equity" in the value of the services they rendered to Turtle Wax.

Plaintiffs entered into a business deal with Turtle Wax which, at the time, they apparently believed was fair, and hoped would be profitable. No doubt, Plaintiffs were disappointed that the SPS and TD lines of products were not more successful, but Turtle Wax was equally disappointed in the sales figures. Both parties suffered financial losses when sales fell flat. It is undisputed that Plaintiffs have received all they were entitled to under the terms of the agreement. In the Court's view, equity does not require that Plaintiffs be given the opportunity to now place a significantly higher value on the services they provided in an effort to compensate for their economic loss on this business venture.

Because no reasonable jury could find that Turtle Wax has retained a benefit "under circumstances where it would be unjust to do so without payment," the Court SUSTAINS Defendant's Motion for Summary Judgment on this claim.

## IV.     Conclusion

Because Plaintiffs' claims of fraudulent misrepresentation and fraudulent concealment are time-barred, and because Plaintiffs' claim of unjust enrichment fails on the merits, the Court SUSTAINS Defendant Turtle Wax's Motion for Summary Judgment. (Doc. #76).

Judgment will be entered in favor of Defendant and against Plaintiffs.

21

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: January 30, 2012

WALTER HERBERT RICE
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record